United States District Court
Southern District of Texas
**ENTERED**
September 05, 2018
David J. Bradley, Clerk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

| | | |
|---|---|---|
| CASCABEL CATTLE COMPANY, LLC, | § | |
|     **Plaintiff** | § | |
| | § | |
| **v.** | § | Civil Action No. B-17-61 |
| | § | |
| UNITED STATES OF AMERICA, ET AL., | § | |
|     **Defendants** | § | |

### REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

On March 15, 2017, Plaintiff Cascabel Cattle Company, LLC ("Cascabel") filed a complaint against the United States of America, the Secretary of Agriculture Sonny Perdue,[1] and Kevin Shea – the Administrator of the U.S. Department of Agriculture's Animal and Plant Health Inspection Service (collectively "Defendants"). Dkt. No. 1. Cascabel seeks relief under the Federal Tort Claims Act ("FTCA") for the loss of cattle because of the allegedly negligent gathering of the cattle and application of pesticides by USDA employees. Id.

On May 30, 2018, Defendants filed a motion to dismiss for lack of subject matter jurisdiction, or alternatively, a motion for summary judgment. Dkt. No. 15. This motion has been referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B).

On July 20, 2018, Cascabel filed a response to the motion to dismiss. Dkt. No. 22. On August 3, 2018, Defendants filed a reply. Dkt. No. 25.

After reviewing the record and the relevant case law, it is recommended that the motion to dismiss for lack of jurisdiction be granted. The FTCA affirmatively withholds jurisdiction for these claims under the quarantine exception found at 28 U.S.C. § 2680(f).

---

[1] Cascabel originally sued Secretary of Agriculture Tom Vilsack. Pursuant to FED. R. CIV. P. 25(d), Sonny Perdue is automatically substituted as the proper defendant.

1

## I. Background

Cascabel's claims arise as a result of a quarantine that was issued for fever ticks in South Texas.  Before discussing the particular facts of this case, it is first necessary to understand the legal context applicable to such quarantines.

### A. Quarantine Policy

Federal regulations mandate that "portions of the State of Texas, the Virgin Islands of the United States, the Northern Mariana Islands, the Commonwealth of Puerto Rico and the Island of Guam are hereby quarantined" permanently to prevent the spread of certain ticks, including Rhipicephalus annulatus ("fever ticks"). 9 C.F.R. §§ 72.1, 72.2.  These fever ticks attach to cattle and then mate; the ticks can transmit diseases which result in fever and anemia. A Dictionary of Entomology 268 (2nd ed. 2011).  Historically, the fever tick has been so destructive to livestock that, in 1893, the Texas legislature created the Livestock Sanitary Commission for the specific purpose of "establishing such interstate quarantine lines, rules, and regulations as shall best protect the live stock industry of this state against Texas or splenetic fever." St. Louis S.W. Ry. Co. of Tex. v. Smith, 20 Tex. Civ. App. 451, 457, 49 S.W. 627, 630 (1899), aff'd sub nom. Smith v. St. Louis & S.W. Ry. Co., 181 U.S. 248 (1901).  The "Texas or splenetic fever" is a reference to the fever caused by fever ticks. U.S. v. Porter Bros. & Biffle, 95 F.2d 694, 696 (5th Cir. 1938).

Federal law permits the Department of Agriculture to "cooperate with other Federal agencies, States or political subdivisions of States," to eradicate fever ticks. 7 U.S.C § 8310(a); 9 C.F.R. § 72.7.  Federal law also provides that it is "unlawful for any person . . . to use any registered pesticide in a manner inconsistent with its labeling." 7 U.S.C. § 136j(a)(2)(G).  The phrase, "to use any registered pesticide in a manner inconsistent with its labeling," is defined as using "any registered pesticide in a manner not permitted by the labeling," with some statutory exceptions listed. 7 U.S.C. § 136(ee).

The "portions of the State of Texas" that are permanently quarantined under federal regulation are defined by reference to 4 TEXAS ADMIN. CODE § 41.14 through 41.22.  9

2

C.F.R. § 72.5. As relevant here, the permanent quarantined area bisects Cameron County.[2] 4 TEX. ADMIN. CODE § 41.22.

Texas regulations further provide that, as it relates to fever ticks, an area can be classified as a "control purpose quarantine area," which is a temporary quarantine.[3] 4 TEXAS ADMIN. CODE § 41.2(a). A control purpose quarantine area is "[a] premise or property designated by the commission for a systematic inspection of livestock and premises and control of the movement of livestock in order to investigate and control a suspected exposure of animals to ticks outside the tick eradication quarantine area." 4 TEXAS ADMIN. CODE § 41.1(5). As applicable here, movement of cattle beyond the temporary quarantine area "must be on a written permit or certificate issued by an inspector of the commission or the United States Department of Agriculture, Animal and Plant Health Inspection Services ["APHIS"], Veterinary Services in accordance with the law and the regulations of the commission." 4 TEXAS ADMIN. CODE § 41.14(a).

Under Texas law, TAHC employees "may enter public or private property, without a warrant, for the exercise of an authority or performance of a duty" to eradicate fever ticks. TEX. AG. CODE § 167.102(a). As a result of this quarantine, the livestock owners "must gather and present all livestock for scratch inspection, dipping, treatment or vaccination required by the commission. The owner or caretaker is responsible for all costs associated with, and labor necessary for, presenting the owner or caretaker's cattle for scratch inspection, dipping, treatment, or vaccination at the location prescribed by the commission."

---

[2] The permanent quarantine is for all areas south of Highway 281, going from the Hidalgo/Cameron County line until it reaches Boca Chica Boulevard in Brownsville and then going south of Boca Chica Boulevard until it intersects the Brownsville Ship Channel and the Gulf of Mexico. 4 TEX. ADMIN. CODE § 41.22. Cascabel raises livestock on land outside of the permanently quarantined area.

[3] It was in such a temporary quarantine area that Cascabel's cattle were located. Unless otherwise noted, any references to a quarantine in the remainder of this report and recommendation are references to a temporary quarantine area.

4 TEXAS ADMIN. CODE § 41.8(1)(D).

   If ticks are found on the premises, before the cattle can be allowed out of the quarantine area, the cattle must "have had two consecutive dips not less than seven nor more than 14 days apart" with follow-up inspections. 4 TEXAS ADMIN. CODE § 41.6(b)(1). TAHC staff shall conduct the dipping of the livestock, using "only those dips that have been approved by the Animal and Plant Health Inspection Service of the United States Department of Agriculture and the commission for use in official dipping to rid animals of the tick." 4 TEXAS ADMIN. CODE § 41.8(2)(A)(v). "If the commission requires livestock to be dipped, the livestock shall be submerged in a vat." 4 TEXAS ADMIN. CODE § 41.8(2)(A)(vii). Federal regulations define dipping as "thoroughly wetting the entire skin by either immersion in a chemical solution in a dip vat, or by spraying with a chemical solution using a spray-dip machine or a hand-held sprayer." 9 C.F.R. § 72.25.

   The United States Department of Agriculture ("USDA") has approved coumaphos (proprietary brand name "Co-Ral") for use in eradicating fever ticks. 9 C.F.R. § 72.13(b). The regulation specifically approves Co-Ral in a "25 percent wettable powder or flowable form labeled for use as a 0.25 percent dip and used at a concentration of 0.125 to 0.250." Id. While the regulation is oddly phrased, it appears that the words "25 percent" only modify "wettable powder" and do not apply to "flowable form."[4] See Coumaphos (Co-Ral ), 49 FR 33134-01 (proposed August 21, 1984) (to be codified at 9 C.F.R §§ 72.13, 73.10) (proposed regulation permitting "flowable form" of Co-Ral to be used, "[i]n addition to the 25 percent wettable powder."); Coumaphos (Co-Ral ); Approval for Treatment of Cattle, 50 FR 430-01 (January 4, 1985) (final rule issued approving of proposed regulation). The final rule – which added the "flowable form" of Co-Ral to the list of approved pesticides – did not

---

[4] This Court has previously held that the words "25 percent" only applied to the wettable powder and not the flowable form. Davis v. United States, No. 1:15-CV-159, 2016 WL 7392229, at *5 (S.D. Tex. Dec. 21, 2016). Cascabel has not argued that the Court's decision in Davis is incorrect or distinguishable from the facts in the instant case.

specify the appropriate concentration of pesticide to be applied to the livestock. Id.

The labeling instructions state that when dipping or spraying animals for ticks, one gallon of flowable Co-Ral shall be mixed with 200 gallons of water. Dkt. No. 22-2, p. 6. Only USDA employees and approved contractors are permitted to use and/or apply Co-Ral. Dkt. No. 22-1, p. 5.

Dr. Daniel Baca, a USDA veterinarian, was designated by the Defendants "as the person who has the knowledge of the applicable policies and procedures related to the proper application of Co-Ral insecticide to livestock." Dkt. No. 15-5, pp. 7-8. At his deposition, Baca testified that "as far back as 1980," animal health professionals were using the "42 percent flowable" form of Co-Ral to eradicate fever ticks. Id., p. 11. He explained that the 42 percent referred to the level of concentration within the package, but that the solution actually applied to the livestock "is diluted substantially to, like, .18 percent to .20 percent." Id, p. 11.

Furthermore, Federal law establishes that, when the USDA operates "in areas where tick eradication is being conducted in cooperation with State authorities," the cattle cannot be "shipped or transported interstate for any purpose[,]" until the livestock have been inspected and certified by a USDA APHIS inspector. 9 C.F.R. § 72.7. In other words, if the federal authorities are participating in a state-declared quarantine, the livestock cannot leave the state until a USDA inspector clears them.

Finally, whether the requirements are established by regulations or statutes, the import is the same. See Perez v. Mortg. Bankers Ass'n, — U.S. —, 135 S. Ct. 1199, 1203 (2015) (Regulations "have the force and effect of law.").

With this regulatory and statutory context in mind, the Court turns to the facts of the claims made by Cascabel.

### B. Factual Background

Daniel Davis owns Cascabel Cattle Company, which he testified had about 300 head of Brama cattle in 2014. Dkt. No. 22-9, p. 6.  The cattle were being raised on property west of Laguna Vista, Texas. Id.

On September 10, 2014, TAHC declared a fever tick quarantine in an area of Cameron County that included the Laguna Vista land where the cattle were being raised. Dkt. No. 15-1, p. 20.  On that date, TAHC issued a quarantine notice to Davis, stating that his cattle could not be moved "until they have been scratch inspected and dipped." Id.  No party disputes that the quarantine was declared by the State of Texas. Dkt. No. 28, p. 2 (Defendants stating that TAHC declared the quarantine).

During his deposition, Davis testified that five of his cattle died as a result of APHIS personnel using a faulty cattle chute to scratch and inspect the cattle for ticks as a result of this quarantine. Dkt. No. 22-9, p. 10.  Davis explained that the portable chute used by APHIS personnel would cause cattle to pile up; as one animal moved to the front to be inspected, the cattle behind it in the chute would crash into each other.  He testified that "the bigger cow is gonna – gonna knock the smaller cow down, or if they get a calf in between there, well, he – he gets squashed totally." Id., p. 9.  Davis testified that during the gathering process, two of his cattle died when their necks were broken by USDA personnel who were rounding up the cattle for inspection. Dkt. No. 15-3, p. 6.  Davis actually created a chute that solved the problem by narrowing the chute opening so the animals couldn't pile up and injure each other. Id.  Davis testified that he spent between $23,000 and $25,000, to create the chute. Id., p. 11.

Davis further testified that he lost seven cattle as a result of the dipping. Id., p. 6.  According to Davis, the cattle were treated with Co-Ral in a dipping vat – where the cattle are run through a large vat of water – with Co-Ral added to the water. Dkt. No. 15-3, p. 5.  Davis testified that he requested that his young cattle be hand-sprayed to protect them from any adverse effects, but USDA officials refused. Id.

6

On February 18, 2015, TAHC issued another quarantine for Davis's cattle in Laguna Vista. Dkt. No. 15-1, p. 21.

Jimmy Coy, a USDA animal health technician, testified that livestock were considered quarantined until they had two consecutive "clean" treatments. Dkt. No. 22-7, p. 12.  In other words, after the initial treatment to kill any fever ticks found in the herd, the cattle were required to undergo at least two additional treatments and each of those treatments would have to reveal no other ticks. Id., pp. 12-13.

Coy explained that in Cameron County, the USDA uses dipping vats, spray boxes, and hand sprayers to apply Co-Ral. Dkt. No. 22-7, p. 16.  Davis testified that the spray boxes were used on his cattle in March 2017 and were not used before that date. Dkt. No. 15-3, p. 7.  Coy testified that when the spray boxes are used, all of the doors are locked and the spray box is "not ventilated." Dkt. No. 22-7, pp. 24-25.  The exact dimensions of the box are not part of the record, but it is designed so that one cow is treated at a time. Dkt. No. 22-4, p. 6.

The procedure involves the spray box operator unleashing a spray of the diluted Co-Ral mixture – similar to a shower – in the closed box for 30 seconds. Dkt. No. 22-7, pp. 23-25.  The spray box is then opened to give the livestock  "a chance to breathe" and the USDA employees check the spray nozzles to make sure they are working properly. Id., pp. 23-25.  The animal is then exposed to another burst of spray for 20 to 30 seconds. Id, pp. 23-25.

Davis testified that he had "probably another three or four" cattle die as a result of the spray box process. Dkt. No. 15-3, p. 7.  Davis explained that after being treated with the spray box, the cattle "would stumble, [. . .] but they wouldn't get up. So we would get them out of the way, and we would, you know, try to give them, [. . .] you know, try to give them water, you know, feed them, and they didn't make it." Id.

**C. Procedural History**

On September 15, 2016 – after the cattle were dipped, but before they were sprayed – Cascabel filed an administrative claim with the Department of Agriculture. Dkt. No. 10-1.  The claim was not officially denied or accepted within six months of that date, rendering it a final denial under federal law. 28 U.S.C. § 2675(a).

7

On March 15, 2017, Cascabel filed a complaint in this Court, pursuant to the FTCA, against the Defendants. Dkt. No. 1.  Cascabel claimed that it suffered losses as a result of the negligent application of Co-Ral to its livestock, as well as the negligent rounding up of cattle. Id.

On May 30, 2018, Defendants filed a motion to dismiss for lack of subject matter jurisdiction, or alternatively, a motion for summary judgment. Dkt. No. 15.  As to the jurisdictional arguments, Defendants asserted that the FTCA affirmatively withholds jurisdiction for claims arising from a quarantine as well as discretionary decisions, both of which apply to the facts of this case. Id.  Defendants also asserted that any claim related to the use of the spray boxes was administratively unexhausted.

On June 6, 2018, the Court informed the parties that it would hold the motion for summary judgment in abeyance, pending resolution of the jurisdictional issues. Dkt. No. 17.

On July 20, 2018, Cascabel filed a response to the motion to dismiss. Dkt. No. 22. Cascabel argued that the quarantine exception to the FTCA only applies to instances where the imposition of the quarantine was the proximate cause of damages. Id.  The Court understands Cascabel to be arguing that the decision to declare – or not to declare – a quarantine is protected from suit by the FTCA, but any "subsequent negligent and illegal actions" committed by the Defendants in carrying out the quarantine are not protected. Id, p. 15 (emphasis original).  Cascabel further asserts that the quarantine exception is not applicable in this case, because the negligent application of Co-Ral is the proximate cause of its loss. Id.  As to the discretionary function exception, Cascabel argues that Defendants did not have discretion to ignore the label or misuse Co-Ral. Id.

On August 3, 2018, Defendants filed a reply. Dkt. No. 25.

On August 10, 2018, Cascabel, as requested by the Court – Dkt. No. 24 – filed a surreply as to the applicability of the discretionary function exception of the FTCA. Dkt. No. 27.

On August 10, 2018, Defendants filed a supplemental brief, arguing that the quarantine exception applies in this case, because the quarantine was "imposed by the United States." Dkt. No. 28.[5]

On August 17, 2018, Cascabel filed a supplemental brief on the quarantine exception, arguing that because the quarantine was declared by the TAHC, the FTCA's quarantine exception was inapplicable in this case. Dkt. No. 29.

## II. Applicable Law

### A. Jurisdiction

The threshold question, before considering the substance of any claim, is whether the court possesses jurisdiction over the claim. This is the case, because federal courts are courts of limited jurisdiction, whose authority exists only within the boundaries established by Congress and the United States Constitution. Ruhrgas AG v. Marathon Oil Co., 526 U.S. 574, 583-84 (1999). A plaintiff bears the burden of proving jurisdiction. Choice Inc. of Tex. v. Greenstein, 691 F.3d 710, 714 (5th Cir. 2012).

In determining whether jurisdiction exists, the Court may consider: "(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." Ramming v. U.S., 281 F.3d 158, 161 (5th Cir. 2001). Conclusory allegations or "legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." Wells v. Ali, 304 Fed. App'x. 292, 293 (5th Cir. 2008) (quoting Fernandez–Montes v. Allied Pilots Ass'n, 987 F.2d 278, 284 (5th Cir. 1993)).

---

[5] In a companion case, the Court ordered the parties to brief whether the quarantine exception applies when the quarantine is declared by a state authority, as was done in this case. Delgadillo v. U.S., Civil Case No. 1:17-59, Dkt. No. 26. The parties were informed that their responses in Delgadillo would also be applied to the instant case. Id.

**B. Federal Tort Claims Act**

The FTCA is a limited waiver of sovereign immunity, which permits the United States to be sued for "injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment." 28 U.S.C. § 1346(b). Statutes, waiving the sovereign immunity of the United States, are to be "construed strictly in favor of the sovereign." Jeanmarie v. U.S., 242 F.3d 600, 604-05 (5th Cir. 2001) (citing McMahon v. U.S., 342 U.S. 25 (1951)).

## III. Analysis

Cascabel seeks relief pursuant to the FTCA for the loss of its cattle due to: (1) the use of the spray box; (2) the negligent gathering and inspecting of the cattle; and, (3) the use of the dipping vat. While Cascabel focuses upon liability, the Court must first consider jurisdiction because, in the absence of jurisdiction, the Court is without authority to consider the merits of the claim. As to all of Cascabel's claims, they are barred by the quarantine exception to the FTCA.

Should the District Court determine that the quarantine exception does not apply in this case, the claims relating to the spray box are unexhausted and should be dismissed on that basis for lack of jurisdiction. Further, the claims relating to the negligent gathering and inspecting of the cattle are barred by the FTCA's discretionary function exception. On the other hand, the claims relating to the use of the dipping vat are not barred by the discretionary function exception, which would allow them to proceed.

The Court will consider the exhaustion question first. It will then turn to the discretionary function exception as to the death of the cattle during the round up and then the death of the cattle as a result of the use of pesticides. Finally, the Court addresses the overarching exception that applies to all of these claims: the quarantine exception. With that map the Court turns to the question of jurisdiction.

### A. Exhaustion

The Court lacks subject matter jurisdiction over a FTCA claim "unless the claimant shall have first presented the claim to the appropriate Federal agency." 28 U.S.C. § 2675(a). This requirement is jurisdictional. In re Katrina Canal Breaches Litig., 351 F. App'x 935, 936 (5th Cir. 2009). In order to meet this requirement, "an FTCA claimant must provide the agency with facts sufficient to allow his claim to be investigated." Life Partners Inc. v. U.S., 650 F.3d 1026, 1030 (5th Cir. 2011) (internal quotation marks omitted).

Cascabel has not exhausted any claims related to the use of the spray box. As previously noted, Cascabel filed its administrative claim on September 15, 2016. Dkt. No. 10-1. Davis testified that the spray box was not used on his cattle prior to March 2017, six months after Davis filed his administrative claim. Dkt. No. 15-3, p. 7. Thus, at the time that the claim was made, Cascabel could not have pled any facts relating to a spray box that had not yet been used against its cattle. Accordingly, any claims regarding the spray box are premature and unexhausted. Accordingly, the Court lacks the subject matter jurisdiction to consider them.

Even if such claims were timely before the Court, they would still be barred under sovereign immunity, as set out further below.

### B. Sovereign Immunity

"It is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction." U.S. v. Navajo Nation, 537 U.S. 488, 502 (2003). The FTCA "is recognized as providing a waiver of sovereign immunity and provides the sole basis of recovery for tort claims against the United States." Gonzalez v. U.S., 851 F.3d 538, 543 (5th Cir. 2017). While the FTCA is generally a waiver of sovereign immunity, the statute expressly withholds consent to be sued for claims involving certain governmental functions. 28 U.S.C. § 2680.

"Congress' primary concern in enumerating the § 2680 exceptions was to retain sovereign immunity with respect to certain governmental functions that might otherwise be

disrupted by FTCA lawsuits." <u>Molzof v. U.S.</u>, 502 U.S. 301, 311-12 (1992).  Congress was also concerned about "ensuring that 'certain governmental activities' [would] not be disrupted by the threat of damage suits." <u>Kosak v. U.S.</u>, 465 U.S. 848, 858 (1984).  Section 2680 "marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals." <u>U.S. v. Varig Airlines</u>, 467 U.S. 797, 808 (1984).

The exceptions contained in § 2680 are to be construed "broadly" so as to give full effect to the Government's intentional withholding of consent. <u>Davila v. U.S.</u>, 713 F.3d 248, 256 (5th Cir. 2013); <u>Atorie Air, Inc. v. F.A.A. of U.S. Dep't of Transp.</u>, 942 F.2d 954, 958 (5th Cir. 1991); <u>Lehman v. Nakshian</u>, 453 U.S. 156, 161 (1981) ("limitations and conditions upon which the Government consents to be sued must be strictly observed and exceptions thereto are not to be implied.").

The Court notes that none of the exceptions found in § 2680 contain a reasonableness requirement.  In other words, the Government is not required to establish that it acted reasonably in order to maintain the protections of sovereign immunity. <u>See</u> <u>Formula One Motors, Ltd. v. U.S.</u>, 777 F.2d 822, 824 (2d Cir. 1985) (holding that the Court would not read a reasonableness requirement into the statute because the § 2680 exemptions serve "to insulate the United States from litigation over precisely such issues").

If <u>any</u> of the exceptions listed in § 2680 apply to a claim, then the Court lacks subject matter jurisdiction over the claim. <u>Bell v. U.S.</u>, 238 F.3d 419 (6th Cir. 2000).  With this foundation in mind, the Court turns to whether the discretionary function exception found at § 2680(a), or the quarantine exception found at § 2680(f), apply in this case.

## 1. Discretionary Function

As discussed earlier, the United States has not waived sovereign immunity for claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a).  The Court applies the two-

12

part Gaubert test to determine if this exception applies: (1) whether the challenged act involves an element of judgment; and (2) whether that judgment was designed to be shielded by the exception. U.S. v. Gaubert, 499 U.S. 315, 322 (1991).

While Gaubert was decided in the context of Federal Deposit Insurance Corporation supervision and regulation of banks, its treatment of the FTCA's discretionary function exception applies in cases beyond that context. See Huff v. Neal, 2014 WL 274500, *8 (5th Cir. 2014) (unpubl.) (applying Gaubert to prison security decisions); In re Katrina Canal Breaches Litig., 696 F.3d 436, 451 (5th Cir. 2012) (applying Gaubert to design and construction of levees); Davis v. U.S., 597 F.3d 646, 650 (5th Cir. 2009) (applying Gaubert to search and rescue missions).

The Court must first identify the harms alleged and the decision being challenged. Fothergill v. U.S., 566 F.3d 248, 253 (1st Cir. 2009). In doing so, the Court notes that there is no dichotomy between "discretionary functions and operational activities." Gaubert, 499 U.S. at 326.[6] In this case, Cascabel has sought relief for (1) the way in which the cattle were rounded up and inspected and (2) the dipping of young cattle in water treated with Co-Ral. The Court will address each of these claims separately.

### a. Round-up & Inspection

Cascabel has argued that USDA employees killed cattle by breaking their necks when rounding them up for inspection and placing them in a poorly-designed chute when conducting the inspections. The discretionary function exception precludes subject matter jurisdiction for this claim.

For the first element of the Gaubert test – whether the Defendants had any discretion in making their decisions – to apply, the Court must determine whether "there was 'room for

---

[6] Cascabel cites the Fifth Circuit's holding in Gaubert v. U.S., 885 F.2d 1284 (5th Cir. 1989) for the proposition that policymaking is protected by the discretionary function, but operational application of the policy is not. Dkt. No. 22, p. 23. While that was a correct summary of the Fifth Circuit's holding, that distinction was rejected by the Supreme Court when it overruled the Fifth Circuit upon further review in that case. Gaubert, 499 U.S. at 326.

choice' in making the allegedly negligent decision." Ashford v. U.S., 511 F.3d 501, 505 (5th Cir. 2007). Clearly no room for choice exists "when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow. In [such an] . . . event, the employee has no rightful option but to adhere to the directive." Berkovitz by Berkovitz v. U.S., 486 U.S. 531, 536 (1988). That is not the case here.

In this case, there is no statute, regulation, or policy that mandates how USDA employees should gather and inspect cattle and Cascabel has not identified such a policy. In short, the Defendants had complete discretion in deciding how best to gather and inspect the cattle. Thus, the first prong of the Gaubert test has been met.

As to the second prong of the Gaubert test – whether the discretionary function exception was designed to protect this kind of choice – the court must "consider whether the actions taken are susceptible to policy analysis." Gibson v. U.S., 809 F.3d 807, 812 (5th Cir. 2016). The discretionary function exception "was enacted to prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." Gibson, 809 F.3d at 813 (internal quotation marks omitted). Thus, the question before the Court is not whether Defendants actually "engaged in a policy analysis" prior to reaching a decision; instead, the question is whether the decision was "susceptible to policy analysis." Gonzalez v. U.S., 851 F.3d 538, 544 (5th Cir. 2017).

Clearly the decision involved here – how to gather and inspect the cattle – is susceptible to policy analysis. Based upon the harm posed by fever ticks and how many (or how few) had already been found in Cameron County, USDA officials would be expected to weigh how to gather and inspect the cattle against any threat posed by not acting quickly enough. If the infestation was fast-moving and widespread, the Defendants could decide, as a matter of policy, that it was more important to emphasize gathering and inspecting the cattle quickly, rather than safely. See Bailey v. U.S., 623 F.3d 855, 863 (9th Cir. 2010) ("so long as a decision involves even two competing interests, it is 'susceptible' to policy analysis

14

and is thus protected by the discretionary function exception.").  As noted earlier, the Court does not look to whether the Defendants actually engaged in such analysis, but whether the decision was one that could have been based on policy considerations.  Gonzalez, 851 F.3d at 544.  The decisions in this case clearly were the type of policy decisions that the discretionary function exception was designed to protect.  Accordingly, the second element of the Gaubert test is satisfied.

Thus, the discretionary function exception applies and precludes subject matter jurisdiction for any claim made by Cascabel relating to the gathering and inspecting of its cattle.  For that reason, this claim should be dismissed without prejudice.

### b. Pesticides

In addition to its claims regarding the collection of the cattle, Cascabel also challenges the application of pesticide in the spray vats to eradicate the ticks.  Cascabel asserts that the government agents applied the pesticide in violation of various laws, regulations, policies, and labeling. Dkt. No. 22, pp. 21-22.

As previously noted, the first element of the Gaubert test asks whether "there was 'room for choice' in making the allegedly negligent decision." Ashford, 511 F.3d at 505.  If a federal statute "specifically prescribes a course of action for an employee to follow," then no such room for choice exists. Berkovitz, 486 U.S. at 536.  In this case, the question before the Court is whether the government employees had discretion in how they applied the pesticides to the cattle.

Federal law clearly states that it is "unlawful for any person . . . to use any registered pesticide in a manner inconsistent with its labeling." 7 U.S.C. § 136j(a)(2)(G).  The phrase "to use any registered pesticide in a manner inconsistent with its labeling" is defined as using "any registered pesticide in a manner not permitted by the labeling," with six exceptions: (1) using the pesticide at a lower dose than recommended, unless the label prohibits using a reduced dose; (2) applying it to target a pest not included on the labeling, unless the labeling permits application on the crop, animal or site it is being applied to; (3) applying it in a way

15

not prohibited on the labeling, unless the label prohibits any use not listed; (4) mixing the pesticide with a fertilizer, unless the pesticide label expressly prohibits mixing it; (5) use is in conformance with other laws; or (6) use that is expressly permitted by the EPA. 7 U.S.C. § 136(ee).  Given that a federal statute required that the pesticides be used in accordance with the labeling instructions, the government agents did not have the authority to ignore the label. Berkovitz, 486 U.S. at 536.  Defendants concede this point. Dkt. No. 25, p. 13 (admitting that the product label limits "the discretion of government employees in applying a pesticide.")

The fact that the USDA employees had no discretion to ignore the label is fatal to any claim that the discretionary function exception applies in this case. Lopez v. U.S. Immigration & Customs Enf't, 455 F. App'x 427, 432 (5th Cir. 2011) (when the complaint alleges that a federal employee violated "a nondiscretionary federal law, regulation, or express policy, a suit against the United States may go forward subject to other FTCA, state tort law, and procedural requirements.").  The complaint in this case clearly alleges that USDA employees violated the instructions given on the label. See Dkt. No. 1, p. 5 (Defendants "improperly requir[ed] Plaintiff to dip its cattle by . . . total immersion [. . . ] which causes ingestion and inhalation, which is contrary to the EPA approved label.").

While Defendants concede that the federal employees had no discretion to ignore the label's instructions, they argue that the label was not violated in this case. Dkt. No. 25, pp. 9-12.  Whether this assertion is true is not something that the Court should resolve at the jurisdictional stage. Garza v. U.S., 161 F. App'x 341, 346 (5th Cir. 2005).

Whether a non-discretionary duty exists is a question that bears on jurisdiction under the discretionary function exception; whether such a duty was actually violated is a merits-based question.  In Garza, the Fifth Circuit found that a prison guard had a non-discretionary duty to patrol the prison yard at certain times, rendering the discretionary function exception inapplicable in that case. Garza, 161 F. App'x at 345.  The Fifth Circuit further stated that "a finding on whether or not [the guard in question actually] patrolled the yard was not

16

necessary," to resolve the jurisdictional question and should be reserved for summary judgment or trial. <u>Garza</u>, 161 F. App'x at 346.  The same analysis holds true in this case; the Court need not determine whether the label was actually violated, in determining if the discretionary function exception applies.

This conclusion follows from the general rule, that a court should avoid adjudicating the merits of the case when deciding the jurisdictional questions. <u>See</u> <u>McClain v. Panama Canal Comm'n</u>, 834 F.2d 452, 454 (5th Cir. 1987) ("The court should not look to the merits in deciding the jurisdictional question.").  The question of whether Defendants actually violated the labeling instructions is a question better reserved for summary judgment or trial. <u>Young v. Hosemann</u>, 598 F.3d 184, 188 (5th Cir. 2010) (When "a complaint asserts a cognizable federal claim, dismissal for want of jurisdiction is disfavored . . . .") (citing <u>Williamson v. Tucker</u>, 645 F.2d 404, 415-16 (5th Cir.1981) (<u>en</u> <u>banc</u>)).

Thus, the discretionary function exception is not applicable to any claims arising out of the use of the dipping vat and would not otherwise bar jurisdiction.

This conclusion benefits Cascabel little, since Cascabel's claims – the use of the dipping vat, the use of the spray box and the gathering and inspecting of the cattle – are all barred by the FTCA's quarantine exception, as explained below.

### 2. Quarantine

As relevant here, the Government has not waived its immunity for "[a]ny claim for damages caused by the imposition or establishment of a quarantine by the United States." § 2680(f) (hereafter "quarantine exception").  In other words, if a claim is the result of the "imposition or establishment of a quarantine by the United States," then the FTCA does not waive sovereign immunity and such claims must be dismissed.  To determine the applicability of the exception, the Court must resolve what constitutes the imposition or establishment of a quarantine.

The quarantine exception has been litigated very rarely.  The most relevant case was decided over 40 years ago. <u>Rey v. U.S.</u>, 484 F.2d 45, 48 (5th Cir. 1973).  In <u>Rey</u>, the Fifth

Circuit concluded that the quarantine exception applies "only to damages proximately caused by the 'imposition or establishment of a quarantine,' such as loss in value occasioned by physical restraint on livestock for a period of time or losses caused by the forced exposure of healthy animals to diseased animals within the quarantine area." Rey, 484 F.2d at 48. The exception, however, does not apply to "[d]amages incidental to the quarantine itself, for example, damage caused by the negligent operation of a motor vehicle during the quarantine inspection process." Id. (emphasis added). The Fifth Circuit explained that the quarantine exception serves as a bar "only to damages proximately resulting from quarantine status." Rey, 484 F.2d at 48, n. 4.[7]

The crux of Cascabel's complaint is that the USDA employees negligently gathered and inspected his cattle and then followed it up by negligently applying the pesticide in violation of its label, causing the cattle to inhale it, killing them. Dkt. No. 1, pp. 5-6. Cascabel argues that it is not contesting the decision to impose a quarantine. Instead, its challenge is to the actions taken during the quarantine – the gathering, inspecting and treating of the cattle, which – according to Cascabel – would put its claims outside of the quarantine exception. Dkt. No. 22, p. 20. Given the nature of the quarantine in the instant case, this argument is unavailing.

The language of the quarantine exception is broadly written, covering damages caused by the "establishment or imposition" of a quarantine "by the United States." § 2680(f). When interpreting a statute, "the plain language of a statute controls, reading it as a whole and mindful of the linguistic choices made by Congress." Bombardier Aerospace Corp. v. U.S., 831 F.3d 268, 273 (5th Cir. 2016) (quoting In re Universal Seismic Assocs., Inc., 288 F.3d

---

[7] In Rey, plaintiffs amended their complaint to avoid the quarantine exception, claiming that the damage to their livestock was not caused by a quarantine, but was based upon a government official's misdiagnosis of the livestock's condition. Rey, 484 F.2d at 48-49. The Fifth Circuit affirmed the dismissal, concluding that the amended claim was barred by the FTCA's negligent misrepresentation exception. Id, citing § 2680(h). No negligent misrepresentation claim has been raised in this case.

205, 207 (5th Cir. 2002)) (internal quotation marks omitted).  Additionally, "different words within the same statute should, if possible, be given different meanings." BNSF Ry. Co. v. U.S., 775 F.3d 743, 755, n. 86 (5th Cir. 2015) (quoting Firstar Bank, N.A. v. Faul, 253 F.3d 982, 991 (7th Cir. 2001)).

The statute in the instant case refers to the "establishment or imposition" of the quarantine.  In analyzing the statute, the Court notes that there are instances where the word "or," between two words, is read disjunctively to convey two separate ideas and other instances where it is read conjunctively to mean synonymous terms. Compare Garcia v. U.S., 469 U.S. 70, 73 (1984) ("use of the term 'or' indicates an intent to give the nouns their separate, normal meanings") and Encino Motorcars, LLC v. Navarro, — U.S. —, 138 S. Ct. 1134, 1141, 200 L. Ed. 2d 433 (2018) (the word "or" is "almost always disjunctive.") with U.S. v. Olano, 507 U.S. 725, 732 (1993) (reading "error or defect" to refer conjunctively to a single category of errors) and McNally v. U.S., 483 U.S. 350, 358-359 (1987) (second phrase in disjunctive, added simply to make the meaning of the first phrase "unmistakable," giving rise to conjunctive definition).

While cognizant of this potential conflict, the Court must assume that the statute is written disjunctively, unless it is shown that Congress used synonymous surplusage "to make a statute crystal clear rather than just clear." In re Collins, 170 F.3d 512, 513 (5th Cir. 1999).  Indeed, as noted above, the use of "or" is "almost always disjunctive." Encino Motorcars, 138 S. Ct. at 1141.  With these principles in mind, the Court turns to the words at issue in this case: "establishment" and "imposition."

The statute itself does not define these terms; accordingly, the Court must believe, "absent sufficient indication to the contrary, that Congress intends the words in its enactments to carry their ordinary, contemporary, common meaning." Matter of England, 153 F.3d 232, 235 (5th Cir. 1998) (internal quotation marks omitted).  In doing so, the Court can look to dictionaries to ascertain the ordinary meaning of the word. Id.  In this case, the Court will examine the plain meaning of the words, when the quarantine exception was passed into

law.  See Sandifer v. U.S. Steel Corp., 571 U.S. 220, 227 (2014) (utilizing dictionary definitions from the era when the underlying statute was enacted).  The language in the statute was proposed in 1940[8]; was passed in 1946; and has not been amended since then. Pub. L. No. 601, 79th Cong., 2d Sess. (Aug. 2, 1946).

At the time that the quarantine exception was initially proposed, the word "establishment" was defined as "the action or means of establishing," and "the fact of being established," and also referred to a "legal enactment." "Establishment," Oxford English Dictionary (1933).  Another dictionary from that time period defined establishment as "the act of establishing" or "the means of establishing" or "a settled arrangement or order, especially a rule, decree, law, or code of laws." "Establishment," Webster's New International Dictionary (2d ed. 1934).

Those same dictionaries defined "imposition" as "the action of imposing or laying as a burden, duty, charge, or task; the action of inflicting, levying, enjoining or enforcing." "Imposition," Oxford English Dictionary (1933).  It was also defined as "that which is imposed, specifically that which is laid on, inflicted, levied or enjoined." "Imposition," Webster's New International Dictionary (2d ed. 1934).

The difference between these words is evident from their definitions.  In this context, "establishment" of a quarantine refers to the decision to impose – the "legal enactment" – or not to impose a quarantine.  On the other hand, "imposition" refers to how the quarantine is actually carried out, namely how the Government chooses to enforce the quarantine, i.e. how to isolate and eradicate the underlying harm.  Thus, the statute covers both the decision to enact – or not enact – a quarantine, as well as how any quarantine will be enforced.

As previously noted, the exceptions found in § 2680 should be read "broadly." Davila, 713 F.3d at 256.  Read in this light, the criteria for releasing an animal from quarantine status is necessarily a subset of the imposition of a quarantine.  In other words, the imposition of

---

[8] The Federal Tort Claims Act, 56 Yale L.J. 534, 561 (1947)

a quarantine includes: who or what will be quarantined; the treatments required during the quarantine; and, under what circumstances one will be released from quarantine (including if an animal will ever be released from quarantine, given the nature of the harm being eradicated).

This interpretation gives each word a different meaning that describes different actions and neither word is rendered surplusage. See Corley v. U.S., 556 U.S. 303, 314 (2009) (reading a statute to avoid surplusage is "one of the most basic interpretive canons."). Furthermore, this interpretation is consistent with the view that Congress passed this statute to "retain sovereign immunity with respect to certain governmental functions that might otherwise be disrupted by FTCA lawsuits." Molzof, 502 U.S. at 311-12.  If litigants could sue the Government for negligent governmental decisions authorizing quarantines or negligent application of the method used to eradicate the underlying disease, it would potentially paralyze important governmental action.  Through the quarantine exception, the Government allowed itself the discretion to decide how far to go in eradicating disease and disease-carrying animals, free from the concerns of inevitable litigation.[9]

Furthermore, the words "caused by" should also be construed broadly.  The quarantine exception uses the phrase "caused by" as opposed to most of the other § 2680 exceptions, which refer to claims "arising out of" certain governmental actions. See § 2680(b), (c), (e), (h), (j), (k), (l), (m), (n) (all using "arising out of").  The "caused by" limitation is used one

---

[9] The Court notes that this reading of the statute does not give the Government a blank check to impose quarantines without limitation.  Instead, the limitation simply precludes FTCA tort damages for establishing or imposing a quarantine.  The imposition of a quarantine can violate a litigant's constitutional or other statutory rights. See Crowder v. Kitagawa, 81 F.3d 1480, 1485 (9th Cir. 1996) (quarantine, that had the effect of banning seeing eye dogs, violated the ADA); Webster v. Moquin, 175 F. Supp. 2d 315, 317 (D. Conn. 2001) (considering whether quarantine violated due process rights).  Thus, the FTCA has simply barred litigants from seeking monetary redress in instances where federal actors were negligent in establishing or imposing a quarantine. § 2680(f); see also St. Tammany Par., ex rel. Davis v. Fed. Emergency Mgmt. Agency, 556 F.3d 307, 321 (5th Cir. 2009) (noting that the FTCA only applies to claims for monetary relief).

other time in § 2680. See § 2680(I) ("Any claim for damages caused by the fiscal operations of the Treasury or by the regulation of the monetary system").

The Courts have not directly addressed what the "caused by" language in § 2680(f) (quarantine exception) and § 2680(I) (treasury exception) encompasses.   Courts have interpreted other statutes, that use the "caused by" language, to require a showing of proximate cause. Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co., 513 U.S. 527, 536 (1995) (interpreting the "caused by" language in 46 U.S.C. § 30101 to require "what tort law has traditionally called proximate causation."). In contrast, cases involving the other FTCA exceptions – containing the "arising out of" language – have concluded that such exceptions cover any action that occurred during the performance of the specified action. See Jeanmarie v. U.S., 242 F.3d 600, 604 (5th Cir. 2001) (holding that a claim of false arrest and battery against a customs officer arose out of a customs search and was barred by § 2680(c)). The former interpretation – requiring proximate cause – appears to be consistent with the Fifth Circuit's approach, that the quarantine exception serves as bar "only to damages proximately resulting from quarantine status." Rey, 484 F.2d at 48, n. 4.

Such an interpretation is also consistent with the drafters' apparent intent regarding the statute.   In 1940, Congress considered a bill which was a forerunner to the FTCA; the language of the quarantine exception in the proposed bill is identical to the language used in § 2680(f).[10]  During Congressional hearings, Alexander Holtzhoff – a special assistant to the attorney general – testified about the drafting of the bill, based upon his working closely with the House and Senate committees that drafted it. Hearings before the Senate Committee on the Judiciary on S. 2690, 76th Cong., 3d Sess. (1940) 33.

As to the quarantine exception, Holtzhoff testified that "[i]t seemed to the draftsmen

---

[10] The 1940 hearings have been described as "invaluable source material" for analyzing the FTCA.  This conclusion results from the fact that the language of the 1940 proposed FTCA legislation tracks closely with the FTCA statute passed in 1946 and, further, because "the hearings and reports on the 1946 Act are extremely sketchy." The Federal Tort Claims Act, 56 Yale L.J. 534, 561 (1947).

of the bill that as to this type of claims it might be rather dangerous to permit suits to be brought under a general statute such as this.  If they are to be recognized, it should be under a private act in those instances where any relief is proper." Id., at 38.  From this it appears that Congress did not want quarantine-based suits to be brought under a general tort statute, given that a quarantine for a highly-contagious disease could result in numerous and costly claims. Id.  Instead, Congress could pass a more limited relief act, one which would fairly compensate victims. Id.

Furthermore, the legislative report attached to the bill – that actually became the FTCA – indicates that the quarantine exception was considered as part of a group of exceptions for "claims which relate to certain governmental activities which should be free from the threat of damage suit." Report of the Joint Committee on the Organization of Congress to Accompany H.R. 181, House. Rep. No. 1287, 79th Cong., 1st Sess. (1945) 6.

Retaining sovereign immunity, for both the decision to declare a quarantine and the methods by which the quarantine is carried out, is consistent with the Congressional intent to keep quarantine decisions "free from the threat of damage suit." Id.  It also does not inhibit Congress's discretion to pass a bill specifically to compensate the victims of a quarantine.[11]

In short, the quarantine exception immunizes the Government from suit for damages proximately caused by the decision whether to impose a quarantine and any actions undertaken by the Government to carry out the purposes of the quarantine.  The Government retains this immunity even if it acts negligently in carrying out the quarantine. Formula One Motors, 777 F.2d at 824 (FTCA exceptions cover negligent actions, because the purpose of the exceptions is "to insulate the United States from litigation over precisely such issues").

_____

[11] The Court notes that Congress could also pass a private law, that would specifically grant this Court jurisdiction to hear Cascabel's claims. See Priv. L. No. 634, Part 2, 56 Stat. 1259 (granting the Eastern District of Oklahoma jurisdiction to consider the claims of D.X. Sanders, who claimed that he lost 150 cattle due to Government agents negligently applying pesticides designed to kill ticks); U.S. v. Sanders, 145 F.2d 458, 459 (10th Cir. 1944).  No such enactment has occurred in the instant case.

On the other hand, the quarantine exception does not immunize the Government from negligent acts that are incidental to the quarantine, such as a Government accidentally breaching a fence. Rey, 484 F.2d at 48.

The Court recognizes that this interpretation covers a broad range of actions and severely limits governmental liability for decisions instituting quarantines and directing the application of remedies as part of that quarantine. That interpretation, however, seems consistent with the guidance that all of the exceptions, found at § 2680, "must be strictly construed in favor of the government." Truman v. U.S., 26 F.3d 592, 594 (5th Cir. 1994).

As previously noted, if the quarantine is the proximate cause of the damages, then sovereign immunity bars this suit. In the instant case, "proximate cause" arises as a result of the imposition of the quarantine. Rey, 484 F.2d at 48, n. 4. The only reason that Cascabel's livestock were gathered, inspected, and exposed to the pesticides was because of the quarantine. In fact, Davis was required – under penalty of criminal conviction – to submit his livestock to the pesticides. TEX. AGRIC. CODE § 167.141(a)-(b). Moreover, Federal regulations prohibited the cattle from being shipped or transported interstate until after they were dipped. 9 C.F.R. § 72.7. Thus, the gathering of the cattle and their exposure to the pesticides was not an unfortunate incidental harm that was only tangentially related to the quarantine; all of those actions constituted the entire purpose of the quarantine.

Cascabel asserts that the negligent gathering and inspection process, and the negligent use of the pesticides – not the imposition of the quarantine – were the proximate cause of the death of the cattle. Cascabel's proffered cause, however, does not preclude a finding that the quarantine was also a proximate cause of the harm. A brief examination of the pertinent law demonstrates this fact.

"The substantive law of the state which is the site of the alleged tort governs claims under the FTCA," which in this case is Texas. Morales v. U.S., 371 F. App'x 528, 532 (5th Cir. 2010). Under Texas law – and even under general common law principles – "there may be more than one proximate cause of an event." In re Air Crash at Dallas/Fort Worth Airport

on Aug. 2, 1985, 919 F.2d 1079, 1086 (5th Cir. 1991); see also Bustamante v. Ponte, 529 S.W.3d 447, 457 (Tex. 2017) ("There may be more than one proximate cause of an injury."). Once the quarantine was declared, the movement of the cattle was limited, until specified federal and state regulations – requiring the cattle to be subjected to pesticides to kill any ticks – were satisfied. 9 C.F.R. § 72.7; § 72.11; § 72.18(b); TEX. AGRIC. CODE § 167.141(a)-(b). Thus, the quarantine was inextricably linked with the application of the pesticides and both were proximate causes of the alleged harm.

Furthermore, while the quarantine was established by Texas, it was imposed under terms established by the United States. USDA employees used Co-Ral; decided how much Co-Ral would be used; the manner in which it was applied; and that the cattle could not leave the quarantine, until a USDA inspector certified them for interstate commerce. 9 C.F.R. § 72.7.

Cascabel seeks to separate the decision to declare a quarantine from how the quarantine was actually applied to its livestock. Dkt. No. 22, p. 20 (stating that it is not challenging the decision to impose a quarantine, but "the subsequent negligent and illegal actions undertaken by the Defendant's representatives." Id. (emphasis original). As the Court has noted, this explanation does not account for the fact that how the quarantine is actually applied to the cattle is inextricably linked with the decision to impose a quarantine. Cascabel seeks to separate the policy decision, to establish a quarantine, from the operational details of the quarantine. Given that the statute must be construed "broadly" to protect the Government from liability, this reading of the statute is untenable. Davila, 713 F.3d at 256.

The Court is mindful that the Government's actions in this case may have killed 14 head of cattle, out of a herd of 300, and that the rancher has no current recourse in the courts. Nevertheless, Congress has decided that – to ensure that the Government can effectively utilize quarantines to eradicate contagious harms – such a cost must be borne and that the government is not amenable to suit for actions regarding those decisions.

25

Before concluding that this is an unfair burden, it's necessary to appreciate that those in Cascabel's situation were not without recourse.  In the 2014 Farm Bill, Congress appropriated funds for the Emergency Assistance for Livestock, Honeybees and Farm-Raised Fish Program (known as "ELAP"). 7 U.S.C. § 9081(d).  Under this program, emergency relief was available to "eligible producers of livestock . . . to aid in the reduction of losses due to disease (including cattle tick fever)." § 9081(d)(1).  The program offered relief to owners of livestock that died as a result of an "eligible loss condition," which included "losses resulting from gathering livestock to treat cattle tick fever." 7 C.F.R. § 1416.102-104.  As relevant here, individuals were required to provide a notice of loss within "30 calendar days of when the loss is apparent to the participant." 7 C.F.R. § 1416.107(a)(3).  The record does not state whether Cascabel took advantage of this program.  This form of relief seems to be the exact relief envisioned by Congress, and testified to by Holtzhoff in the hearings regarding the FTCA, which would make it consistent with exemption from the FTCA.

Finally, Cascabel argues that "[t]he applicability of the quarantine exception should not over ride federal statutory law." Dkt. No. 29, p. 4.  The Court understands Cascabel to be arguing that the quarantine exception should not override other statutes, which they claim the Defendants violated during the course of the quarantine.  Cascabel further argues that "[g]ranting the USDA the right to (I) be shielded from its statutory violations and (ii) ignore its own standard of care as created within the Guidelines is to give license to USDA to continue with its past practices of ignoring the law and the property rights of the cattle raisers." Id.  This argument, about the government's interpretation of the exception overriding federal statutory law, ignores a basic point: the quarantine exception is itself a federal statute.  Taken to its logical conclusion, Cascabel would have the Court ignore the quarantine exception, to allow a tort remedy for violations of other statutes.

No matter how tempting, the Court is not permitted to ignore statutes simply because they produce an undesirable result.  First Nat. City Bank v. Compania de Aguaceros, S. A., 398 F.2d 779, 784 (5th Cir. 1968) (The Court "cannot ignore statutes merely because they

are harsh."); <u>Baker Botts L.L.P. v. ASARCO LLC</u>, — U.S. —, 135 S. Ct. 2158, 2169 (2015) ("Our unwillingness to soften the import of Congress' chosen words even if we believe the words lead to a harsh outcome is longstanding."). Rather, it is the Court's task to give effect to the statute as it is written. <u>Lester v. Exxon Mobil Corp.</u>, 879 F.3d 582, 587 (5th Cir. 2018). In this case, Congress has chosen to withhold jurisdiction for tort claims that occurred as the result of the establishment or imposition of a quarantine by the United States. The Court is in no position to second guess that decision. <u>Wheeler v. Pilgrim's Pride Corp.</u>, 591 F.3d 355, 385 (5th Cir. 2009) ("Courts, however, cannot take the place of Congress in deciding matters of policy.").

Given the plain language of the statute, the quarantine exception is applicable to this case. Accordingly, the Government has sovereign immunity from suit in this case and the claim should be dismissed without prejudice for lack of jurisdiction. <u>Truman</u>, 26 F.3d at 594.

## IV. Recommendation

It is recommended that the motion to dismiss filed by Defendants United States of America, Sonny Perdue, and Kevin Shea be granted and this case be dismissed without prejudice for lack of subject matter jurisdiction.

The parties have fourteen (14) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with the Honorable Rolando Olvera, United States District Judge. 28 U.S.C. § 636(b)(1) (eff. Dec. 1, 2009). Failure to file timely objections shall bar the parties from a <u>de novo</u> determination by the District Judge of an issue covered in the report and shall bar the parties from attacking on appeal factual findings accepted or adopted by the district court except upon grounds of

plain error or manifest injustice. See § 636(b)(1); Thomas v Arn, 474 U.S. 140, 149 (1985); Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1428-29 (5th Cir. 1996) superseded by statute on other grounds, 28 U.S.C. § 636(b)(1) (extending the time to file objections from ten to fourteen days).

DONE at Brownsville, Texas, on September 5, 2018.

_____

Ronald G. Morgan
United States Magistrate Judge